UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
—————————————————————

DANA BECKHORN,

Plaintiff,

-against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION; Acting Commissioner ANTHONY
J. ANNUCCI, in his official capacity; Deputy
Commissioner for Program Services JEFFREY
MCKOY, in his official capacity; and THE STATE
OF NEW YORK,

Defendants.

—————————————————————

**COMPLAINT**

Index No. _____

Assigned Judge:

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiff Dana Beckhorn ("Plaintiff") brings this civil rights action to remedy ongoing violations of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act.

2.      Plaintiff is currently incarcerated by the New York State Department of Corrections and Community Supervision ("DOCCS").

3.      Plaintiff previously completed the first phase of a substance use disorder treatment program administered by DOCCS, which qualified him for a work release program and for early release from incarceration on July 6, 2018.

4.      In March 2018, Plaintiff was transferred to Rochester Correctional Facility to participate in the work release program, which allows inmates to work outside of prison in the community during the day.

5.      Staff at Rochester C.F. refused to allow Plaintiff to participate in the work release program because he had a pre-existing occupational shoulder injury.

6.      Defendants proceeded to revoke Plaintiff's "merit date" of July 6, 2018, based solely on his disability-based removal from the work release program, meaning that he was no longer eligible for release to parole on that date.

7.      Defendants' conduct constitutes unlawful disability-based discrimination and retaliation in violation of the ADA and Rehabilitation Act.

8.      Plaintiff seeks declaratory and injunctive relief, as well as compensatory damages and attorney's fees.

## PARTIES

9.      Plaintiff DANA BECKHORN is currently serving a term of imprisonment in the custody of DOCCS.

10.     Plaintiff is currently an inmate at Wyoming C.F. in Attica, Wyoming County, New York.

11.     NEW YORK STATE is a public entity as defined by 42 U.S.C. § 12131(1)(A).

12.     NEWYORK STATE is a recipient of federal funds.

13.     DOCCS is an arm of New York State.

14.     Upon information and belief, Defendant ANTHONY J. ANNUCCI is the Acting Commissioner of DOCCS.

15.     In that capacity, Mr. Annucci is the Chief Executive Officer of DOCCS and is charged with the overall responsibility for the proper and lawful administration of all facilities within the jurisdiction of DOCCS, including the actions and conduct of those officers, agents, and/or employees who are employed at such facilities.

16.     Mr. Annucci has the authority to promulgate, amend, and enforce rules and regulations governing the administration of all facilities within the jurisdiction of DOCCS.

17.     Mr. Annucci has the authority and responsibility to determine an inmate's eligibility for a merit time allowance.  7 N.Y.C.R.R. § 280.4(b).

18.     Mr. Annucci is sued in his official capacity for injunctive relief only.

19.     Defendant JEFFREY MCKOY is the Deputy Commissioner for Program Services at DOCCS.

20.     Mr. McKoy is responsible for the administration of inmate programs by DOCCS, including the merit time program.

21.     Mr. McKoy is sued in his official capacity for injunctive relief only.

## JURISDICTION

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343(a)(3).

## VENUE

23.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b), as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## FACTS

### The CASAT Program

24.     The Comprehensive Alcohol and Substance Abuse Treatment program is a three-phase program that assists inmates with histories of substance use disorder for return to the community through education and counseling. 7 N.Y.C.R.R. § 1950.1.

25.     Phase I of CASAT consists of an intensive six-month residential substance abuse treatment in a DOCCS facility. 7 N.Y.C.R.R. § 1950.2.

26.     Phase II of CASAT is a community reintegration phase during which participants are transferred to a DOCCS work release facility for participation in a temporary release program. 7 N.Y.C.R.R. § 1950.2.

27.     Once participants are granted release to parole supervision, they enter Phase III, an aftercare component that includes substance use treatment. 7 N.Y.C.R.R. § 1950.2.

### The Temporary Release Program

28.     As described *supra*, CASAT participants who advance to Phase II are transferred to a DOCCS work release facility to participate in one of DOCCS' temporary release programs.

29.     DOCCS' temporary release programs allow inmates who are within two years of their earliest release date to become reintegrated back into their families and communities on a gradual basis.

30.     Among the types of temporary release programs are (1) work release, and (2) community service leave.

31.     The work release program allows an eligible inmate to leave a facility for up to 14 hours per day to perform paid work for outside employers. 7 N.Y.C.R.R. § 1900.3(f).

32.     The community services leave program allows eligible inmates to leave the premises of a correctional facility for up to 14 hours per day to participle in volunteer work for outside organizations, such as municipalities or non-profit organizations. 7 N.Y.C.R.R. § 1900.3(b).

### The Merit Time Program

33.     To incentivize good behavior and program participation while in DOCCS custody, New York allows inmates to earn time off their sentence through good behavior and successful program participation.

34.     Under the merit time program, inmates serving determinate sentences for certain non-violent offenses can reduce their sentence by two-sevenths.

35.     Inmates may receive merit time allowances if they have achieved certain significant programmatic objectives, have not committed any serious disciplinary infractions, and have not filed any frivolous lawsuits.  7 N.Y.C.R.R. § 280.1.

36.     Regarding the programming requirements of the merit time program, DOCCS' regulations state that to be eligible for merit time, an inmate must:

> a.  Successfully perform and pursue his most recently earned eligibility plan, which is a program plan developed in consultation with the inmate's guidance counselor and facility programming staff; and
>
> b.  Complete one of the following:
>
>> i.  Earn a general equivalency diploma (G.E.D.);
>>
>> ii.  Receive an alcohol and substance abuse treatment certificate;
>>
>> iii.  Receive a vocational trade certificate; or
>>
>> iv.  Perform 400 hours or more of community service work.

37.     In 2006, DOCCS amended its merit time regulations to provide that an inmate who meets the eligibility criteria for merit time is nevertheless ineligible if the inmate "was a participant in the temporary release program but was removed for any reason other than an intervening circumstance beyond the control of the inmate." 7 N.Y.C.R.R. § 280.2(d)(2)(ii).

38.     The regulatory intent of this provision was to strengthen incentives for inmates to sincerely apply themselves when granted the opportunity to participate in the temporary release program.  N.Y. Reg., Mar. 22, 2006, at 7.

**Plaintiff's Disability**

39.     Plaintiff is 44-years old and is currently serving a four-year sentence for a non-violent offense.

40.     Prior to being incarcerated, Plaintiff experienced a major injury to his left shoulder while employed as a crane operator at Dresser-Rand in Olean, NY, in 2014.

41.     Plaintiff's injury required surgical implantation of metal rods, and resulted in permanent limitations to his range of motion and ongoing pain.

42.     The injury limited Plaintiff's ability to work and he applied for worker's compensation benefits. He received worker's compensation medical benefits and was pursuing a claim for cash benefits at the time of his incarceration in 2015.

**Plaintiff successfully completes of Phase I of the CASAT program**

43.     Plaintiff entered DOCCS custody on April 29, 2016.

44.     He was subsequently placed in the CASAT program and transferred to Hale Creek Correctional Facility to participate in Phase I of the program.

45.     Upon successfully completing Phase I of the CASAT program, Plaintiff was found eligible for participation in DOCCS' temporary release programs.

46.     As part of the eligibility review process for temporary release, Plaintiff was evaluated by DOCCS medical staff on or around January 30, 2018.

47.     DOCCS medical staff determined that Plaintiff's disability imposed some limitations on his ability to seek and maintain employment in the community, but would not totally prevent him from doing so.

48.     After successfully completing Phase I of CASAT at Hale Creek C.F., Plaintiff

was transferred to Rochester Correctional Facility on or around March 6, 2018, to complete

Phase II.

49.     On or around March 7, 2018, Defendant Annucci issued Plaintiff a merit time

allowance based on his successful program participation and positive record during

incarceration.

50.     Defendant Annucci's issuance of the merit time allowance made Plaintiff eligible

for release to parole on July 6, 2018, and he was scheduled to appear before the parole board in

May 2018.

**Defendants exclude Plaintiff from the temporary release program because of his disability**

51.     Rochester C.F is a minimum security facility that offers work release and

community services leave programming.

52.     Individuals participating in these programs reside at the facility and work outside

in the community during the day.

53.     After arriving at Rochester C.F., Plaintiff met with Offender Rehabilitation

Counselor ("ORC") Penzo to discuss his programming placement.

54.     ORC Penzo asked Plaintiff what types of work he could do.

55.     Plaintiff responded that he could not work as a crane operator anymore and would

need a lighter type of duty.

56.     ORC Penzo asked why Plaintiff could not work as a crane operator anymore, and

Plaintiff proceeded to tell her about the occupational injury he had experienced before

incarceration, including the fact that he had applied for worker's compensation benefits.

57.     ORC Penzo told Plaintiff that, because of his disability, he might not be able to do work release. She told him he should voluntarily sign out of the work release program and instead apply for the community service leave program.

58.     Plaintiff told ORC Penzo that he would do whatever staff recommended he do, but asked for assurance that opting out of work release would not jeopardize his eligibility for early release from incarceration on July 6, 2018.

59.     After ORC Penzo assured Plaintiff that this proposed program plan would not negatively affect his release date, Plaintiff agreed and applied for community service leave rather than work release.

60.     Plaintiff later went out on a community service trip and spent half a day raking leaves and picking up trash at a park in Rochester.

61.     Around this time, Plaintiff also left the facility several other times for various purposes, including going to a church to receive donated clothing, going to the mall to get coffee, and going to a chemical dependency clinic for orientation to Phase II of the CASAT program.

62.     Around this time, Plaintiff was scheduled to appear before the Temporary Release Committee ("TRC").

63.     The TRC is tasked with evaluating the suitability and performance of participants in the temporary release program and can make recommendations regarding continued program participation.

64.     At this first TRC appearance, the TRC members told Plaintiff that, because of his disability, they thought it would be best if he remained at the facility and worked in the kitchen until his merit release date of July 6, 2018.

65.     Plaintiff agreed to this new plan, and began working in the facility kitchen the next day.

66.     Plaintiff later began working additional jobs inside Rochester C.F.

67.     In addition to working in the facility kitchen, his job duties during this time included regular work on the grounds crew, and on one occasion he physically delivered a miniature refrigerator to the office of the one of the facility's deputy superintendents.

68.     On some days, Plaintiff worked from 5 a.m. until midnight.

69.     Sometime after his first appearance before the TRC, Plaintiff received a notice stating that Rochester C.F. Superintendent Akinyemi Awopetu had denied his application for community service leave.

70.     Plaintiff was then scheduled to appear before the Temporary Release Committee a second time.

71.     The notice referring him to the TRC stated that the reason for the referral was "Subject was denied community service leave by [Superintendent] due to inmate's request to remain unemployed and statement of not being able to work, because he's involved in a worker's compensation case."

72.     Plaintiff appeared before the TRC on April 10, 2018, and explained that he had never refused to work, and had only opted out of work release because ORC Penzo said he should do so because of his disability.

73.     Plaintiff explained that his disability imposed some limitations on the type of work he could perform but did not prevent him from seeking employment.

74.     In response, the TRC Chairperson asked Plaintiff what types of work he could do outside the facility.

75.     Plaintiff stated that he could do jobs that do not involve intensive manual labor, such as secretarial work.

76.     The TRC Chairperson responded that even if Plaintiff worked as a secretary at Xerox, for example, he could still fall off his chair and injure himself, and New York State could not afford to take that risk given his disability.

77.     Plaintiff proceeded to explain that he already worked daily at the facility kitchen and asked why he was considered capable of working for DOCCS inside the facility but not capable of working outside the facility.

78.     The TRC members responded that work release is different because it might affect his workers' compensation case, and that he could not do community service because the Superintendent had said no.

79.     The TRC Chairperson told Plaintiff that she wanted to thank him for "doing the things that you do around here," referring to his work at Rochester C.F.

80.     The TRC hearing concluded with the TRC members commending Plaintiff's work ethic and assuring him that their decision to deny him work release was merely for his benefit and would not count against him.

81.     The TRC Chairperson explicitly stated to him: "You didn't do nothing wrong. . . . You're not being punished at all. . . . Everybody's looking out for you."

82.     Five days later, Plaintiff was transferred from Rochester C.F. to Wyoming C.F., a medium security prison that does not offer temporary release programming.

83.     After arriving at Wyoming C.F., Plaintiff was told that his July 6, 2018 merit release eligibility date had been revoked due to his removal from the temporary release program

at Rochester C.F., and that he would remain in prison until at least February 4, 2019—his next possible release date.

**Defendants' unlawful discriminatory conduct inflicts serious harm on Plaintiff**

84.     In September 2018, while Plaintiff was incarcerated at Wyoming C.F., his 20-year old son was seriously injured in a bus accident in Arizona.

85.     Plaintiff's son was hospitalized in a coma for a month. In October 2018, he died as a result of the injuries suffered in the accident.

86.     Staff at Wyoming C.F. told Plaintiff that if his son had been in New York State, he would have been granted a furlough to see him and attend his funeral, but because he was out of state, Plaintiff would not be allowed to go.

87.     But for Defendants' discriminatory conduct, Plaintiff would have been released to parole July 6, 2018, meaning he could have visited his son in the hospital before he died and could have attended his son's funeral.

88.     Plaintiff has a 19-year old daughter who lives in Arizona, as well as three minor children who live in Wellsville, NY.

89.     Before being incarcerated, Plaintiff had primary custody of his minor children.

90.     Plaintiff plans to be an active father in his children's lives after release from DOCCS.

91.     Plaintiff's prolonged incarceration has prevented him from reuniting with his family, seeking necessary medical care, resolving his worker's compensation case, and otherwise reintegrating into the community and moving on with his life.

## FIRST CLAIM FOR RELIEF

**Disability Discrimination in Violation of Title II of the Americans with Disabilities Act**

92.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity." 42 U.S.C. § 12132.

93.     Plaintiff is a qualified individual with a disability for purposes of DOCCS' temporary and early release programs, including the merit time program.

94.     Defendants have excluded him from participation in and denied him the benefits of DOCCS' temporary release and early release programs, including the merit time program, because of his disability.

## SECOND CLAIM FOR RELIF

**Disability Discrimination in Violation of Section 504 of the Rehabilitation Act**

95.     Section 504 of the Rehabilitation Act of 1973 provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

96.     Plaintiff is a qualified individual with a disability for purposes of DOCCS' temporary and early release programs, including the merit time program.

97.     Defendants have excluded Plaintiff from participation in and denied him the benefits of DOCCS' temporary release and early release programs, including the merit time program, because of his disability.

## THIRD CLAIM FOR RELIEF

### Retaliation and Interference in Violation of the Americans with Disabilities Act

98.     The ADA provides that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a).

99.     The ADA also provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by" the ADA. 42 U.S.C. § 12203(b).

100.     Plaintiff engaged in activity protected by the ADA when he asked to participate in work release with disability-related limitations, applied for the community service leave program due to staff concerns about his disability, and protested Defendants' refusal to allow him to participate in temporary release.

101.     Defendants discriminated and retaliated against Plaintiff by excluding him from participation in the temporary release program and revoking his merit time allowance.

102.     Defendants interfered with Plaintiff's rights under the ADA by excluding him from participation in the temporary release program and revoking his merit time allowance.

## FOURTH CLAIM FOR RELIF

### Retaliation and Interference in Violation of Section 504 of the Rehabilitation Act

103.     Section 504 of the Rehabilitation Act of 1973 prohibits a recipient of federal funds from intimidating or retaliating against any individual for the purpose of interfering with any right secured by Section 504. 28 C.F.R. § 42.503(b)(1)(vii).

104.    Plaintiff engaged in activity protected by § 504 when he asked to participate in work release with disability-related limitations, applied for the community service leave program due to staff concerns about his disability, and protested Defendants' refusal to allow him to participate in temporary release.

105.    Defendants retaliated against Plaintiff and interfered with his Section 504 rights by excluding him from participation in the temporary release program and revoking his merit time allowance.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment for Plaintiff and issue an order:

(a)     Declaring that Defendants' conduct violates the ADA and Section 504 of the Rehabilitation Act;

(b)     Preliminarily and permanently enjoining Defendants from excluding Plaintiff from early release programs based on his removal from the temporary release program;

(c)     Preliminarily and permanently enjoining Defendants to reinstate Plaintiff's merit time allowance and ensure he is considered for early merit release by the New York State Board of Parole;

(d)     Awarding Plaintiff compensatory damages;

(e)     Awarding Plaintiff reasonable attorney's fees and costs; and

(f)     Granting such other relief as the Court deems just and proper.

DATED:  December 12, 2018
     Buffalo, NY

                             _s/Andrew Stecker_____
                             ANDREW STECKER, Esq.
                             *Attorney for Plaintiff*
                             Prisoners' Legal Services of New York
                             Karen Murtagh, Esq., Executive Director
                             14 Lafayette Square, Suite 510
                             Buffalo, NY  14203
                             (716) 854-1007
                             astecker@plsny.org