UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DANA BECKHORN,

          Plaintiff,

   v.                                                                18-CV-1452
                                                                      Decision & Order
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, *et al.*,

          Defendants.

_____


     On December 12, 2018, the plaintiff, Dana Beckhorn, an inmate at Wyoming

Correctional Facility, filed this action against the defendants under the Americans with

Disabilities Act ("ADA") and the Rehabilitation Act ("RA").  Docket Item 1.  On the same

day, Beckhorn moved for a preliminary injunction and to expedite hearing and briefing

on his motion for a preliminary injunction.  Docket Item 2.  On December 13, 2018, the

Court ordered an expedited briefing schedule and hearing.  Docket Item 3.  On

December 24, 2018, the defendants answered and responded to Beckhorn's motion for

a preliminary injunction.  Docket Items 7 and 8.  On December 28, 2018, Beckhorn

replied, Docket Item 9, and  on January 2, 2018, this Court held a hearing at which

Beckhorn testified and heard oral argument on the motion.[1]  Docket Item 11.  For the

reasons that follow, Beckhorn's motion for a preliminary injunction is GRANTED.

_____

     [1] Even though the papers established conflicting versions of the facts, the
defendants offered absolutely no testimony at the hearing, instead relying on the
plaintiff's heavy burden for injunctive relief.

**<u>FACTS</u>**

The New York State Department of Corrections and Community Supervision ("DOCCS") runs a three-phase program for inmates with histories of substance abuse, called the Comprehensive Alcohol and Substance Abuse Treatment ("CASAT") program, to prepare them to return to the community. 7 N.Y.C.R.R. § 1950.1. The first phase is six months of residential substance abuse treatment in a DOCCS facility. 7 N.Y.C.R.R. § 1950.02(a). The second phase is a "transitional period [with] a community reintegration component, which would include transfer to a work release facility for employment and placement in appropriate community-based programs." 7 N.Y.C.R.R. § 1950.02(b). The community reintegration component could involve community service leave, furlough, industrial training leave, educational leave, or work release. 7 N.Y.C.R.R. § 1900.3(b)–(f). The third phase involves parole supervision and aftercare once participants are granted release by the parole board. 7 N.Y.C.R.R. § 1950.02(c).

The Merit Time Program—another DOCCS program—allows inmates serving sentences for certain nonviolent crimes to receive time off their sentences if they achieve "certain significant programmatic objectives, have not committed any serious disciplinary infractions and have not filed any frivolous lawsuits." 7 N.Y.C.R.R. § 280.1. But even if an inmate meets the criteria to earn merit time, the inmate nevertheless will be ineligible for a merit time allowance if the inmate "was a participant in the temporary release program but was removed for any reason other than an intervening circumstance beyond the control of the inmate." 7 N.Y.C.R.R. § 280.2(d)(2)(ii). This provision was intended to encourage inmates' sincere participation in DOCCS programs. N.Y. Reg. 7 (Mar. 22, 2006).

Beckhorn is currently serving a four-year sentence for a non-violent offense, having entered DOCCS custody on April 29, 2016. Docket Item 1 at 6. In 2014, before he was incarcerated, Beckhorn suffered an injury to his left shoulder while working as a crane operator. Docket Item 2-6 at 1. That injury has limited his ability to work; as a result, he applied for worker's compensation benefits. *Id.* at 2.

According to the complaint, Beckhorn completed Phase I of the CASAT program at Hale Creek Correctional Facility. Docket Item 1. In March 2018, Beckhorn received a merit time allowance for hours of outside work and completion of a substance abuse certification. Docket Item 2-9. That merit time allowance made Beckhorn eligible to appear before the parole board in May 2018, *id.*, and eligible for parole release on July 6, 2018, Docket Item 2-6 at 5.

On March 6, 2018, Beckhorn was transferred to the Rochester Correctional Facility to complete Phase II of CASAT. *Id.* at 7. There, Beckhorn met with Offender Rehabilitation Counselor ("ORC") Beverly Penzo. Docket Item 2-6 at 2. Beckhorn told Penzo that he could no longer work as a crane operator and "about the occupational injury to [his] left shoulder and [his] application for worker's compensation benefits." *Id.* at 3. According to Beckhorn, Penzo responded that Beckhorn might not be able to perform work release, that he should therefore voluntarily sign out of the work release program, and that he instead should apply for the community service leave program. *Id.* Beckhorn also says that Penzo assured him that doing this would not jeopardize his eligibility for merit release from incarceration on July 6, 2018. *Id.* at 3.

Penzo recalls things differently. She denies preventing Beckhorn from pursuing outside employment due to his disability or suggesting that he pursue community

service instead.  Docket Item 7-2.  In fact, Penzo's notes indicate that it was Beckhorn who "reported he cannot work due to his Workmen's Compensation."  *Id.*, Exhibit A.

Beckhorn says that he then "went out on a community service trip" to "rak[e] leaves and pick[] up trash at a park in Rochester" and "left the facility several other times for various furloughs."  Docket Item 2-6 at 3.  Around that time, Beckhorn appeared before the Temporary Release Committee ("TRC")[2] for the first time. Beckhorn says that at that meeting, "the TRC members told [him] that, because of [his] disability, they thought it would be best if [he] remained at the facility and worked in the kitchen until [his] merit release date."  *Id.*

According to Rochester Correctional Facility Superintendent Akinyemi Awopetu, by March 16, 2018, Beckhorn had not sought work as required by the Temporary Release Program.  Docket Item 7-3 at 2.  After more than a month of Beckhorn's refusing to seek taxable employment, Awopetu removed Beckhorn from the Temporary Release Program.  *Id.*

About a month after arriving at the Rochester Correction Facility, on April 9, 2018, Beckhorn appeared before the TRC for a second time.  Docket Item 2-10.  The TRC Review Form states that Beckhorn was referred by Penzo after he "was denied community service leave by supt. due to inmate's request to remain unemployed and statement of not being able to work, because he's involved in a worker's compensation

---

[2] The TRC is a three-member body, 7 N.Y.C.R.R. § 1900.2, tasked with meeting inmates who seek temporary release and making a recommendation about their suitability for the program.  7 N.Y.C.R.R. § 1900.4(l).  The recommendation of the TRC is then forwarded to the Superintendent for review and further recommendation, 7 N.Y.C.R.R. § 1900.4(m), before being sent to the DOCCS central office for final review and decision, 7 N.Y.C.R.R. § 1900.4(n).

case." *Id.* At the TRC hearing, the Chairperson, Joanne Marion, read that reason for referral into the record, and Beckhorn agreed to its accuracy. Docket Item 2-11 at 2. During the course of the hearing, however, Beckhorn insisted that he indeed was capable of working with limitations and that he wanted to work; in fact, he pointed to physical work he had been doing at the facility to demonstrate that. *Id.* at 3. Chairperson Marion replied that Beckhorn had "to be able to get a job on the outside while you're here at work release, and if for some reason you are unable to work, it'd be terrible if we tried to make you go work and something happens to you. Do you see what I mean?" *Id.* Beckhorn suggested that he could do secretarial work, to which Chairperson Marion responded:

> I want you to understand this, okay? I need you to listen closely and understand this when I say this, alright? Okay, you go get a job as a secretary at Xerox, okay? All of a sudden, you're sitting at your chair. You fall. Hypothetical case. Just, like, by chance something happens. Guess what happens? I guess you know what happens next, right? So, what New York State is saying is that we can't take that risk with you. We can't. You know? You're saying you're already [inaudible].

*Id.* at 5. Beckhorn then asked why he could not do community service, and ORC Lipinski, another member of the TRC, explained that the superintendent had denied Beckhorn's application for community service. *Id.* at 7. Lipinski insisted that the TRC was "trying to be protective of you and your [worker's compensation] case on the outside." *Id.* Following the hearing, the TRC recommended that Beckhorn be removed "due to i/m's request to remain unemployed because, active worker's compensation case. Supt. recommended removal due to i/m refusal to work." Docket Item 2-14.

Days later, DOCCS transferred Beckhorn to the Wyoming Correctional Facility, which does not offer temporary release programming. Docket Item 2-6 at 5. On April

24, 2018, Beckhorn was told that his merit time allowance had been revoked "due to refusing work." Docket Item 2-13. A letter from Jeff McKoy, Deputy Commissioner for Program Services, confirmed on August 27, 2018, that Beckhorn became "ineligible for Merit Time based upon [his] removal from Temporary Release, which was due to [his] refusal to seek employment." Docket Item 2-15. For that reason, he did not appear before the parole board in May 2018 as had been previously scheduled. Docket Item 2-6 at 5.

Beckhorn appealed, but his appeal was denied, Docket Item 9-2, and he remains incarcerated at Wyoming Correctional Facility, Docket Item 1 at 2. His earliest possible eligibility for release is now February 4, 2019. Docket Item 2-6 at 6. Beckhorn argues in this action that the defendants violated the ADA and RA by denying him access to the temporary release program because of his disability, which ultimately resulted in the revocation of his merit time allowance and his continued incarceration. He asks the court for a preliminary injunction reinstating his merit time allowance and ordering the defendants to hold a parole hearing. Docket Item 2-2.

## **LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest is not disserved by the issuance of the injunction. *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010). The movant ordinarily must establish these elements "by a clear showing." *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997) (internal citations and emphasis omitted). And when a plaintiff seeks a mandatory injunction—one that will alter rather than maintain the status quo—the burden is explicit: the movant "must show a clear or substantial likelihood of success." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (internal quotations omitted).

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Jayaraj v. Scappini*, 66 F.3d 36, 38-39 (2d Cir. 1995) (quoting *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (quoting *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998)).

"A preliminary injunction is a specific equitable remedy and thus, must be framed in such a way as to strike a delicate balance between competing interests. By necessity, the scope of the injunction must be drawn by reference to the facts of the individual case, reflecting a careful balancing of the equities." *Sunward Elecs., Inc.,* 362 F.3d at 26 (quoting *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62, 67 (2d Cir. 1985)).

## **DISCUSSION**

## I.     **LIKELIHOOD OF SUCCESS ON THE MERITS**

Beckhorn alleges that DOCCS discriminated against him because of his disability, and he now asks the Court to restore his merit time allowance so that he can

go before the parole board and seek release earlier than February 4, 2019. He also brings a claim for retaliation in violation of both the ADA and the RA.[3]

The relief sought by Beckhorn sets the bar high. Requiring the defendants to hold a parole hearing—even if only a few weeks early—alters the status quo. Thus, Beckhorn must show "a clear or substantial likelihood of success." *Sunward Elecs., Inc.*, 362 F.3d at 24.

## A.  Applicable Law

The ADA provides that no "qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The ADA "unmistakably includes State prisons and prisoners within its coverage." *Dep't of Corr. v. Yeskey*, 524 206, 209 (1998). That coverage extends to parole eligibility. *Thompson v. Davis*, 295 F.3d 890, 896-97 (9th Cir. 2002). Thus, to show that he is substantially likely to succeed on his claim of disability discrimination under the ADA, Beckhorn must establish that he has a disability, that he qualified for the merit time program, and that he was denied the program's benefits because of his disability. *See Bolmer v. Oliveira*,

---

[3] This order addresses only Beckhorn's ADA claim, but because discrimination claims under various federal antidiscrimination statutes, including these, are analyzed under virtually the same framework, this analysis covers Beckhorn's claims under each statute. *See, e.g.*, *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) *superseded by statute on other grounds;* (*Cobain v. City of New York*, 1996 WL 583385, at *2 n.6 (S.D.N.Y. Oct. 10, 1996) (noting "virtually identical elements" of ADA and RA); *Bradley v. England*, 502 F.Supp.2d 259, 266 n.4 (D.R.I. 2007) ("the same standards apply to claims under the ADA as under the Rehabilitation Act.").

594 F.3d 134, 148 (2d Cir. 2010) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities" include performing manual tasks, lifting, bending, and working, among others. 42 U.S.C. § 12102(2)(A). "The definition of disability . . . shall be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A).

Under the ADA, the "term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modification to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "To determine whether an individual is qualified, courts look to a program's 'formal legal eligibility requirements.'" *McElwee v. Cty. of Orange*, 700 F.3d 635, 643 (2d Cir. 2012) (quoting *Henrietta D.*, 331 F.3d at 277). An eligibility requirement is not considered essential if a reasonable accommodation would enable an individual to qualify for the benefit. *Id.*

The plaintiff also must show that he was denied the program's benefits because of the disability. Ordinarily, "[t]he burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs claims of discrimination under the ADA." *Ben-Levy v. Bloomberg, L.P.*, 518 Fed. Appx. 17, 18 (2d Cir. 2013). "To establish a prima facie case of discrimination, a plaintiff must demonstrate (1) that he belonged to a protected class; (2) that he was qualified for the

position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Id.* The burden then shifts to the defendants to proffer a legitimate, nondiscriminatory reason for the complained of action, after which the burden shifts back to the plaintiff to produce evidence that the defendant's proffered, non-discriminatory reason is pretextual. *Id.*

But when a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis is unnecessary. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). "Direct evidence of discriminatory treatment is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse action." *United States v. Hylton*, 944 F. Supp. 2d 176, 187 (D. Conn. 2013) (internal quotations omitted), *aff'd*, 590 F. App'x 13 (2d Cir. 2014). In considering whether a decision maker's words demonstrate discriminatory intent, the Second Circuit has explained that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination," whereas the "more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir.2007), *abrogated on other grounds by Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177–78 (2009). To determine whether a remark is probative, courts consider four factors:

> (1) who made the remark (i.e. a decision-maker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision

at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e. whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir.2010).[4]

"If a plaintiff provides direct evidence of discrimination, the burden of proof shifts to the defendants to show that they would have made the same decision regardless of discriminatory animus." *Fair Hous. Justice Ctr., Inc. v. Cuomo*, 2018 WL 4565152, at *11 (S.D.N.Y. Sep. 24, 2018) (internal quotations omitted). Then, to overcome that showing and meet his ultimate burden, the plaintiff may show that the discrimination was nevertheless a but-for cause of the denial of benefits. *See Bolmer*, 594 F.3d at 148 (noting that "it is questionable whether Title II discrimination claims can proceed on a mixed-motive theory after the Supreme Court's decision in [*Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)] where the Court held that the [ADEA] does not authorize a mixed-motive age-discrimination claim," but ultimately not deciding the issue because the plaintiff satisfied the "more stringent [but-for] causation standard.").[5]

Ordinarily, that means some discriminatory animus on the part of the decision maker. But "even absent evidence of illegitimate bias on the part of the ultimate

---

[4] While the Court recognizes that under the ADA, discrimination in employment is distinct from claims that a plaintiff was denied access to public programs, this order nonetheless draws on that well-developed body of law for the standards that generally govern claims under federal antidiscrimination statutes.

[5] Unlike the ADA, which "covers situations in which discrimination on the basis of disability is one factor, but not the only factor, motivating an adverse employment action," *Logan v. Matveeskii*, 57 F. Supp. 3d 234, 254 (S.D.N.Y. 2014) (citation and quotation marks omitted), the Rehabilitation Act "requires that the alleged discrimination take place solely due to an individual's disability." *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016) (citation omitted); see 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, *solely* by reason of her or his disability, be excluded . . .") (emphasis added).

decision maker," evidence of discrimination by a non-final decision maker will suffice "so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process.'" *Holcomb v. Iona College*, 521 F.3d 130, 143 (2d Cir. 2008) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)). In other words, the fact that a person with an impermissible bias "was not the decision maker does not render [] bias in her performance of her duties irrelevant to liability" when she has "institutional influence in recommending and thus influencing the adverse action by a non-biased decision maker." *Doe v. Columbia University*, 831 F.3d 46, 58 (2d Cir. 2016).

### B.    Application

Beckhorn has shown that he suffers a disability. He suffered an injury that required the surgical implantation of metals rods, and that injury has permanently limited the range of motion in his left shoulder. Docket Item 2-6 at 2. Indeed, the Health Services Review that Beckhorn underwent in preparation for temporary release placement found "limited range of motion" and "some limitations for seeking and maintaining employment." Docket Item 2-8. Those limitations amount to a disability within the meaning of the ADA because they limit Beckhorn in major life activities such as lifting and working. 42 U.S.C. § 12102.

Beckhorn also was otherwise qualified for the merit release program. He had already been granted a merit time allowance as of March 7, 2018, demonstrating his qualification. Docket Item 2-9. Had it not been for his removal from the temporary release program for his purported refusal to work—which Beckhorn denies, Docket Item 2-6 at 4—Beckhorn would have continued to qualify for the merit time program. *See* 7 N.Y.C.R.R. § 280.2(d)(2)(ii).

As to whether he was denied benefits because of his disability, Beckhorn most persuasively points to the April 10, 2018 hearing transcript as direct evidence that the TRC acted with discriminatory animus in recommending against his work release. The defendants do not dispute that Beckhorn was denied access to the temporary release program or that the TRC recommended that result. Rather, the defendants argue that Beckhorn refused to work—that on multiple occasions he expressed disinterest in paid work that would have an effect on his expected worker's compensation award. The defendants contend that Beckhorn's refusal to work made him ineligible for the temporary release program. And because he left the program for a reason not "beyond the control of the inmate," 7 N.Y.C.R.R. § 280.2(d)(2)(ii), the defendants argue, there was no discriminatory animus and no but-for cause. But the record belies the defendants' arguments.

In fact, the record includes direct evidence that the TRC harbored and acted upon a discriminatory motive in recommending against Beckhorn's participation in the work release program. At the hearing, Chairperson Marion stated that if the TRC sent Beckhorn to work, Beckhorn might "fall" from his "chair" just "by chance" and that Beckhorn "know[s] what happens next." Docket Item 2-11 at 6. "So what New York State is saying is that we can't take that risk with you." *Id.* That can only mean that because Beckhorn was injured and disabled once, the state could not risk his being injured on the job again.[6] Along the same lines, Marion said, somewhat

---

[6] The defendants are incorrect in their assertion that Beckhon's claim is likely to fail simply because the TRC did not demonstrate ill will. Docket Item 7 at 14. "A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid

13

paternalistically, "if for some reason you are unable to work, it'd be terrible if we tried to make you go work and something happens to you. Do you see what I mean?" *Id.* at 4. Such statements clearly provide a "specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse action." *Hylton*, 944 F. Supp. 2d at 187. Particularly when uttered by the chairperson of a committee in the context of a hearing where Beckhorn's work limitations were the very topic of discussion—a hearing that was held just before that committee took adverse action— these statements provide direct evidence highly probative of disability discrimination.[7] *See Henry*, 616 F.3d at 149.

The fact that the TRC only makes recommendations regarding the temporary release program does not defeat Beckhorn's claim. The TRC is composed of 3 members—one of them the chairperson who made the discriminatory remarks. 7 N.Y.C.R.R. § 1900.2. The TRC meets inmates seeking temporary release and weighs in on their suitability for the program. 7 N.Y.C.R.R. § 1900.4(l). The recommendation of the TRC is then forwarded to the Superintendent for review and further

---

practical disadvantages that might result from unbiased action." *Doe v. Columbia University*, 831 F.3d 46, 58 n.11 (2d Cir. 2016).

[7] "Normally, 'direct evidence' is described as evidence tending to show, without resort to inference, the existence of a fact in question. . . . Strictly speaking, the only 'direct evidence' that a decision was made 'because of' an impermissible factor would be an admission by the decisionmaker such as 'I fired him because he was too old.' Even a highly-probative statement like 'You're fired, old man' still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision. But juries have always been allowed to draw such inferences." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183-85 (2d Cir. 1992) (discussing the difference between direct and indirect evidence sufficient to trigger mixed-motive analysis in ADEA case).

recommendation.  7 N.Y.C.R.R. § 1900.4(m).  The applications then are referred to the

DOCCS central office for review and decision.  7 N.Y.C.R.R. § 1900.4(n).

The TRC thus influences the Superintendent's temporary release decisions;

indeed, that is the reason for its existence.  And because the TRC recommendation is

likely to play a "meaningful role . . . in the process," *Holcomb*, 521 F.3d 143, an

impermissible bias by one or more of its members might well adversely and improperly

"influenc[e] the adverse action by a non-biased decision maker," *Doe v. Columbia*

*University*, 831 F.3d at 58.  Here, then, because the TRC hearing statements

demonstrate impermissible bias by a non-final decision maker that might well influence

the ultimate decision maker, Beckhorn has made the necessary showing of disability

discrimination.  *See Holcomb*, 521 F.3d at 143.

The defendants argue that the real reason Beckhorn was excluded from the

program was his unwillingness to work because any taxable income would adversely

affect his worker's compensation case.  Docket Item 7-2 at 3; Docket Item 7-6 at 2.  In

fact, Penzo's contemporaneous notes from her meeting with Beckhorn say that "he

reported he cannot work due to his Workmen's Compensation."  Docket Item 7-2,

Exhibit A.  Penzo says that Beckhorn told her that he did not want to work for pay

because that might cost him a lot of money in his workers' compensation case.  Docket

Item 7-2 at 3.  And Superintendent Awopetu says that he removed Beckhorn from the

program not because of any disability but because Beckhorn refused to work.  Docket

Item 7-3 at 2.

But even if the Court accepts Penzo's and Awopetu's assertions as true, the

transcript of the second TRC hearing clearly demonstrates that their understanding of

what Beckhorn was saying was erroneous—or at least that Beckhorn changed his mind. At the hearing, the TRC committee members, not Beckhorn, brought up his worker's compensation case. And Beckhorn protested each time. Docket Item 2-11 at 3 ("Marion: . . . Subject was denied [because of] statement of not being able to work because he's involved in a worker's compensation case. . . . Beckhorn: . . . I want to appeal the decision."); at 8 (Lipinski: Well, we're trying to be protective of you and your case on the outside. Beckhorn: Yeah, well, I realize that. It's just getting frustrating for me."). In fact, at the hearing Beckhorn repeatedly said that he was doing physical work at the prison and that he wanted to work outside the prison. Docket Item 2-11 at 4 ("I'm working. I do . . . I work in the kitchen two or three times a day. I do the floors. I'm a laundry porter. And plus, she has me doing other stuff around here.") ("[the risk of working is] a choice I would have to make."); at 5 ("Sixty-five percent disability in my left shoulder. So, I can work but I have limitations."); at 6 (stating he could do "[s]ecretarial work or something like that.") ("I don't see why they can't [let me work outside the facility], because they got me working here so much. It's okay for me to work here but it ain't okay for me to do certain things. I cannot understand that."); at 7 ("I said I could work with limitations." ); at 8 ("I can't even get a furlough and I've been working 10 to 14 hours a day."); at 9 ("I don't have no problems keep continuing what I do."); at 10 ("I wish I could be out there."). So even if Penzo and Awopetu thought—and perhaps misunderstood—that Beckhorn did not want to work, by the time of the hearing that clearly was not the case.[8] And it is the TRC's recommendation and the

---

[8] Much of the dispute between the parties at oral argument focused on whether an inmate submits a general application for any temporary release program or whether an inmate applies for a specific type of work release program, such as community

Superintendent's subsequent decision—not what occurred before—that is the basis of Beckhorn's persuasive claim of disability discrimination.

In sum, Beckhorn has met his burden of demonstrating that his disability was a substantial, but-for cause of his denied access to the temporary release program. *Henrietta D.*, 331 F.3d at 291; *Bolmer*, 594 F.3d at 148. The defendant's proffered permissible reason—Beckhorn's supposed refusal to work—led to the second TRC hearing. Docket Item 2-10. And at that hearing (1) Beckhorn made it clear that he was able and wanted to work and (2) the TRC chairperson made it clear that she would recommend against that because of Beckhorn's disability. For that reason, Beckhorn's disability was a but-for cause of the TRC's unfavorable recommendation, and Beckhorn has demonstrated a substantial likelihood of success on the merits.

---

service or paid work release alone. Presumably, this distinction is significant because it would determine the extent to which Beckhorn refused to participate, or withdrew his participation, in the program. Beckhorn claims that after meeting with Penzo he simply "applied for community service leave rather than work release" at her suggestion. Docket Item 1 at 8. Absent a better-developed record, Beckhorn's position is persuasive. The regulation entitled "Types of Temporary Release" separately lists the several kinds of temporary release: leave of absence, community services leave, furlough, industrial training leave, educational leave, and work release. 7 N.Y.C.R.R. § 1900.3(a)-(f). Furthermore, the few New York courts to consider the issue treat these types of temporary release as separate. *See Kurtish v. Recore*, 220 A.D.2d 936, 633 N.Y.S.2d 85 (3d Dep't 1995) (finding that statutory bar applied to a request to participate in a work release program but not to a request to participate in an industrial training program); *Matter of Diggins v. Recore*, 163 Misc.2d 607, 609, 621 N.Y.S.2d 447 (Sup. Ct. Albany Cty. 1995) ("Although similar, an 'industrial training leave' plainly is not the same thing as a 'work release program.'"). In light of this and despite the sparse record, it appears that after Beckhorn's community service application was denied, he was not afforded a chance, by either ORC Penzo or the TRC, to apply for the work release program even though he very well may have chosen to do so if given the opportunity. Moreover, it does not appear from the record that Beckhorn filed any document or took any action withdrawing from, or actually refusing to participate in, the program.

## II.    IRREPARABLE HARM

Irreparable harm is an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998).  It is the "*sine qua non* for justifying a preliminary injunction."  *Fair Hous. Justice Ctr.*, 2018 WL 4565152, at *11.

Beckhorn argues that his continued incarceration without the benefit of his merit time allowance—which would make him eligible to go before the parole board— constitutes on-going irreparable harm.  Docket Item 2-3 at 13.  According to Beckhorn, but for the defendants' discriminatory conduct, he would have been eligible for parole release on July 6, 2018; instead, he remains incarcerated without a parole hearing. Because exhausting the administrative review process with DOCCS took several months, Beckhorn's eligibility for parole is now just weeks away.

A wrongful deprivation of liberty cannot be redressed.  *See Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302, 310 (D.N.J. 2003) ("As Plaintiff is currently incarcerated and will remain so unless a preliminary injunction is issued, this is a harm which cannot be redressed following a trial.").  Indeed, prolonged confinement itself can support a finding of irreparable harm sufficient to justify preliminarily enjoining a violation of statutory rights.  *See Jolly v. Couglin*, 76 F.3d 468, 482 (2d Cir. 1996) (holding that substantial likelihood that plaintiff would show violation of either Eighth Amendment rights or right to free exercise of his religion, as well as demonstrated physical effects of confinement, "each serve as an independent basis for the district court's conclusion that the plaintiff would suffer irreparable harm.").

Because the plaintiff will remain incarcerated without a parole hearing absent a preliminary injunction, and because Beckhorn's incarceration cannot be undone after

his claim is adjudicated on the merits, this Court finds that he will suffer irreparable harm in the absence of a preliminary injunction.

## III.   BALANCE OF THE EQUITIES AND PUBLIC INTEREST

The balance of the equities favors Beckhorn as well.  He participated in the CASAT program and earned a merit time allowance upon completion of the first phase of that program.  He then took the necessary steps toward phase two, meeting with ORC Penzo and going on furloughs for community service.  Docket Item 2-6 at 3; Docket Item 7-2. at 1.  At his first TRC hearing, he was told that "it would be best if [he] remained at the facility and work[ed] in the kitchen" until his merit release date, Docket Item 2-6 at 3, so he did exactly that.  *Id.* at 7.  And when his application for leave was denied, he went before the TRC again but the TRC recommended that he be removed from the program.

Beckhorn's continued detention for only a few more weeks may seem negligible, but that cuts both ways.  Indeed, the relief he requests—to go before the parole board as though he had never lost his merit time allowance—is simple for the defendants to provide.  And when it is compared to the prospect of Beckhorn's continued incarceration—likely due to disability discrimination—even for a few weeks, the balance of the equities tips in favor of ordering the defendants to hold a parole hearing.

Finally, the public interest will not be disserved by granting Beckhorn's request for a preliminary injunction.  The defendants deemed Beckhorn eligible for the temporary release program, so he must not present any danger to the community should he be released on parole.  Rather, the public's interest in the fair administration

of public programs, and in the protection of statutory rights, weighs in favor of granting a preliminary injunction.

## IV.    EXHAUSTION

The defendants also argue that Beckhorn failed to exhaust his administrative remedies.  The Prison Litigation Reform Act ("PLRA") prevents a prisoner from bringing a federal action "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  But a prisoner need only exhaust the administrative remedies that are "available."  *Ross v. Blake*, 136 S. Ct. 1850, 1860-62 (2016) (remanding to determine whether further administrative process was unavailable).  And because exhaustion is an affirmative defense, the defendant bears the burden of proof on that issue.  *Napier v. Laurel Cty.*, 636 F.2d 218, 225 (6th Cir. 2011).

Here, the defendants argue that Beckhorn should have engaged the inmate grievance process in 7 N.Y.C.R.R. § 701.7.  But the regulation outlining the inmate grievance program specifically states that "[a]n individual decision or disposition of the temporary release committee . . . is not grievable," 7 N.Y.C.R.R. § 701.3(e)(2), so that process was not "available" to Beckhorn.  Beckhorn did appeal the Committee's decision under the regulations for temporary release, and his appeal was denied. Docket Item 9-2; 9-4.  So Beckhorn *has* exhausted the available administrative remedies, and the defendants have not met their burden establishing otherwise.

## **CONCLUSION**

For all the above reasons, it is hereby

ORDERED that the defendants and their officials, agents, and employees, pending a judgment on the merits in this action, shall immediately reinstate the plaintiff's previously revoked merit time allowance; and it is further

ORDERED that the defendants and their officials, agents, and employees shall immediately arrange for the plaintiff to appear before the New York State Board of Parole for consideration of merit release on parole.

Because the plaintiff has limited financial resources and the defendants are unlikely to suffer any damage as a result of this order, no bond is required.


SO ORDERED.

Dated:        January 16, 2019
            Buffalo, New York


            _s/ Lawrence J. Vilardo_____
            LAWRENCE J. VILARDO
            UNITED STATES DISTRICT JUDGE